IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, EX REL. JAMES KOT, : : : **Plaintiffs** : : NEW VITAE, INC, ADAM DEVLIN, COMMUNITY BEHAVIORAL HEALTH and TCR, : : : : **Defendants.** : | No. C9-cv-4613 JKG  **QUI TAM ACTION** |

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF UNDER FALSE CLAIMS ACT. 31 U.S.C. SECTIONS 3729. *et seq*

### *FILED IN CAMERA PURSUANT TO 31 U.S.C. SECTION3730(b) (2)*

Plaintiffs, United States ex rel. James Kot, individually, through their attorneys Donald P. Russo, Esquire, and Andrew Cormier, Esquire, and complaining of the Defendants New Vitae, Inc. and TCR, for their Complaint allege:

### JURISDICTION AND THE PARTIES:

1. Plaintiff is James Kot, PhD, a Licensed Clinical Social Worker, who is licensed by the Social Work Board and provides contract services for the Defendant New Vitae Inc. and Community Behavioral Health, ("CBH"), the Plaintiff resides at 1518 Highland Drive Bethlehem, Pennsylvania, 18015.

2. Defendant is New Vitae, Inc., a Pennsylvania Corporation with corporate offices located at 5201 St Joseph's Road, Limeport, Pennsylvania, 18060.

3.     Defendant is TCR, a Pennsylvania corporation with corporate offices located at 5201 St Joseph's Road, Limeport, Pennsylvania, 18060.

4.     Defendant is Community Behavioral Health, (hereinafter referred to as "CBH") a Pennsylvania corporation with corporate offices at 801 Market Street, 7th Floor, Philadelphia, Pennsylvania 19107.

5.     Defendant is Adam Devlin, an adult individual who resides at 1096 Apple Road, Quakertown, Pennsylvania 18951 controls and oversees the entire operation described in this Complaint.

6..    Plaintiff believes and therefore avers, that Defendant New Vitae, Inc. is wholly owned and controlled by Defendant TCR, and is used as an instrumentality by New Vitae, Inc. to carry out the fraudulent plans and purposes of New Vitae, Inc., and its owner, Adam Devlin.

7.     As required under the False Claims Act, 31 U.S.C. Section 3730(a)(2), the Relator has provided or will provide the Attorney General of the United States and the United States Attorney for the Eastern District of Pennsylvania with a statement of all material evidence and information related to the Complaint. This disclosure statement will support the existence of charging for improper employment practices and the reliance by the United States government on invoices for said improper employment practices.

8. This Court has jurisdiction over this matter pursuant to 31 U.S.C. Section 3730(h) in that the claim for relief alleges that Plaintiff was discriminated against by the Defendants.

9. Venue is proper pursuant to 31 U.S.C. Section 3730(h) and 28 U.S.C. Section 1391(a) in that Defendants are located in this jurisdictional district.

## FACTS:

10. New Vitae is presently accredited by the Joint Commission on the Accreditation of Hospitals (JCAHO).

11. Defendants New Vitae and TCR operate and do business through various other corporate fronts and business entities, such as Mount Trexler Manor, Quakertown House, Tri-County Apartments.

12. Only New Vitae, Inc. is accredited by JCAHO and CSM, the Defendants' JCAHO and CSM application were falsified in order to place clients into other aspects of TCR in general.

13. New Vitae, however, uses the unaccredited entities referred to above to defraud the United States of America by committing Medicaid fraud. Without accreditation CBH would not be able to place any Medicaid clients into the TCR/New Vitae system.

14. The entities referred to above, contrary to federal Medicaid regulations, do not have a licensed clinical director nor are they managed by physicians or licensed clinicians.

15. New Vitae is not licensed, certified, zoned or in any way authorized to provide intensive residential treatment at any of the following locations Mount Trexler Manor, Quakertown House, Tri-County Apartments. However, the clients receiving treatment from the Defendants are unaware of the Defendants lack of certification, licensing, and zoning for intensive residential treatment.

16. The Defendants purport to be providing intensive residential treatment, when in fact; all they are doing is accepting Medicaid funds on behalf of patients who are housed in their own residential off-site apartments or rooms in the local communities in the coverage area of the Defendants. Additionally, Plaintiff believes, and therefore avers that the Defendants received substantial monies for warehousing of these patients and took money from clients.

17. Defendants have a contract with CBH, a Philadelphia based Managed Care Company. Said contract implies that New Vitae will provide CBH clients "intensive inpatient psychiatric services." However, New Vitae offers limited services to a very small percentage of the Defendants' clients, even though far more clients need professional care.

18. Pursuant to applicable state and federal regulations, to truly qualify as an intensive inpatient facility, New Vitae would have to provide twenty four hour care, residential treatment, and on-going staff development, and must adhere to all state regulations that control intensive residential treatment programs including but not limited to staffing regulations. The administrators of Mount Trexlor Manor, Quakertown House or Tri-County Apartments are not licensed clinicians.

19. New Vitae attempts to use Mount Trexlor Manor, Quakertown House, and Tri-County Apartments to offer clinical treatment. However, Mount Trexlor Manor, Quakertown House, and Tri-County Apartments are a boarding facilities specifically prohibited by state and federal regulations to offer such treatment. Moreover, the staffs at Mount Trexlor Manor, Quakertown House, and Tri-County Apartments are marginally qualified. As a result, clients who often are poor, uneducated and unable to advocate for themselves are denied essential and critical services.

20. The Plaintiff has informed his superiors that a full-scale investigation by governmental authorities would reveal glaring deficiencies in staff qualifications, staff training, discrepancies between client needs and services offered, and potential abuse of clients. The Plaintiff pointed out to his superiors that the end result could be the loss of accreditation and accompanying loss of Medicaid and other federal and state revenues.

21.     Plaintiff believes, and therefore avers that in order for Mount Trexlor Manor, Quakertown House, and Tri-County Apartments to provide intensive residential treatment programs that each should have a licensed clinical director on staff. Plaintiff has pointed out to his superiors that the Defendants must have a Clinical Director who will build a team and be responsive to client needs. He also emphasized that the Defendants must immediately begin a Comprehensive Staff Training program, and must upgrade our requirements for recruiting, selecting, and hiring staff.

22.     The Plaintiff also urged his superiors to assess where the overall organization is in terms of federal and state regulations and to take the necessary steps to insure compliance.

23.     Plaintiff believes, and therefore avers, that the Defendants deny seriously mentally ill clients due process of law, and equal protection of law, as well as treatment based on national "best practice standards" of psychiatry, mental health, substance abuse, and even personal care.

24.     The Plaintiff, after notifying his superiors of his concerns, was told that he had to "keep his mouth shut" and was informed: "that's why we pay you $250.00.00 a year". Specifically, Plaintiff was told "we pay you to do therapy, not evaluate how we run the program".

25. Plaintiff was eventually terminated in July 2nd of 2009 for making the complaints referred to herein and after his termination was then threatened with legal repercussions by the Defendants' lawyer if he continued to pursue the complaints against the Defendants.

26. Plaintiff believes, and therefore avers, that the Defendants represent to the public and to governmental and accrediting agencies that they are capable of providing mental health residential treatment services to poor and indigent clients, when in fact, the Defendants do not have the professional competence or capability of providing said services in compliance with the law.

27. Plaintiff believes, and therefore avers, that the primary purpose of the Defendants is to collect Medicaid funds from the federal government on behalf of the aforementioned clients, even though appropriate services and proper care are being denied.

28. The Defendants refuse to hire duly licensed and accredited professional staff necessary to administer the treatment they purport to be giving to their patients.

29. Clients are misled by these defendants into believing they are entering into a fully licensed, fully zoned, clinically competent treatment program when in reality they are being placed many without a "knowing and voluntary consent", into a personal care boarding home or into an environment that essentially isolates and segregates them from their home community of Philadelphia, and family, and friends.

30.     Defendants' misrepresentations to clients therefore forces client to endure unjustified isolation and segregation that deprives them of interacting in a non-mental health settings with non-mental health people; and forces them into living in settings that deny meaningful community interaction, independent living, and even personal choice with respect to freedom of movement, action, and even treatment.

31.     Some client have been in the system over ten (10) years without anyone offering help to return to their home community all to perpetuate the personal care boarding home system to the detriment of client care. In essence since clients are diagnosed with various mental health issues, they are treated as though they are incompetent and not able to make their own decisions, even as they related to various aspects of the program in which they are involved.

32.     This isolation and segregation rises to the level of discrimination simply based on that fact the clients have a mental illness. Most clients are not informed that they have a choice in their treatment placement, and are generally not given alternatives from which to choose, thus are denied the opportunity to make a knowing and voluntary decision.

33.     Plaintiff believes, and therefore avers, that clients who live in the Defendants' apartment program do not have a landlord tenant relationship as required by law. The apartment programs maintained by the Defendants' were institutional in nature. In fact Adam Devlin requested clients not to interact with their neighbors so that we can "stay under the radar". Devlin did not want the community to know how many apartments he purchased for mental health clients. Clients are moved against their will, without notice, and have required curfews. In light of this grouping on mental health clients in this small

space it created an institutional environment by inter-change staff, supervision, medication distribution, and recreation monies which denies community access and independent living skills development. Even the clients that are eventually moved into an apartment are relegate to a collective institutional setting, an environment with mostly untrained staff, or minimally trained staff that are quick to punish, remove privileges, deny home visits, deny off grounds trips etc, all of which amounts to a sense of being incarcerated.

34. This collective institutional mindset perpetrated by staff and administration denies all rights included in the clients' bill of rights, and the client handbook of CBH, TCR, and New Vitae Inc. Each Defendant, knowing these rights are being denied, exhibits absolutely no concern whatsoever.

35. The corporate culture of TCR and New Vitae Inc are one of institutionalization and deprivation of personal freedom choice and liberty, exclusively because the clients are diagnosed with various mental illnesses.

36. In essence TCR and New Vitae Inc function as a "de facto mental health institution" with inflexible rules regulations and such, with no equal protection of clients' constitutional or regulatory rights which in turn fosters a sense of learned helplessness rather than independent living skills, including the lack of any help to return to Philadelphia. All of this is with the blessing and consent of CBH officials.

37.    Many of these clients are involuntarily placed in various aspects of TCR/ New Vitae program' inconsistent to their needs and desires and the government is forced to pay for these unwarranted and unwanted isolated and segregated services.

38.    In light of the fact most clients are minorities, who hailed from Philadelphia, they often complain about being victimized and discriminated against because of their mental health condition, noting with a bitter sense of irony that the US government is paying for the placement. Many minority clients have requested interactions with minority staff, but the Defendants have ignored these requests. This involuntarily placement rises to the level of institutional racism and discrimination.

39.    Many clients have expressed an interest in supportive housing, but the institution provides very little in the way of any assistance in removing themselves from the institutionalized setting.

40.    The only time an opportunity to move to a less segregated and isolated setting is offered is when a client is being forced out of the program due to a rule infraction or disciplinary measure. These crucial decisions are made by unlicensed and unqualified staff without clients' participation.

41.    The goal of the TCR/ New Vitae system is to perpetuate itself, not reintegrate clients back into society. This construct is maintained because there are no clinical persons on the management team that makes all clinical and administrative decisions.

42.    The Plaintiff sent several detailed emails to Defendant CBH detailing the fraudulent actions of the other Defendants. Plaintiff in response received

communications from CBH stating that their clients were receiving little to no treatment from the other Defendants. However, CBH took no action to correct the treatment its patients received from the other Defendants.

43. Plaintiff believes, and therefore avers, that CBH misrepresented the programs of the Defendants as a residential treatment program when CBH had already informed the Plaintiff that their clients received little or no treatment from the other Defendants.

44. Plaintiff believes and therefore avers that CBH was aware of several complaints by African American clients for racist treatment by the other Defendants yet took no action to investigate or correct these actions with the other Defendants. CBH did nothing to stop these practices even after the Plaintiff informed then in writing of violations, including the incidences of racism. CBH knew some staff were racially abusive to minority clients and did little prevent these acts from recurring, which left clients with no one to look out for their interest because most black clients do not have intensive case managers nor active family members to advocate for them.

45. Plaintiff believes and therefore avers that CBH was aware of the Defendants taking actions to evict clients, an action against the client's rights, and did nothing to stop the other Defendants from taking this action.

46. Since most clients do not participate in formal interdisciplinary treatment team meetings there is virtually no opportunity for them to be heard about their personal interests, desires and wishes, which becomes more difficult for them to handle knowing that their government is paying for these services with their tax dollars.

47.    Moreover the institutional setting mindset is maintained by client and staff, by a system that forbids clients to even formulate their own treatment plan, while simply being told to sign one that was prepared by administrative officials without their input.

48.    The U.S. government is billed for these services in a way that is inconsistent with the clients' needs or desires. Simply because these clients have mental illnesses they are presumed to be unable to express their individual therapeutic needs and desires, leading to feelings on their behalf of being in prison with no chance of becoming independent or returning to clients' home communities.

49.    The only time supportive housing is offered is when a discharge is ordered by the management team as a punishment for a rules infraction. Since there is no over-all clinical person directing treatment per se clients often languish many years, day in and day out, without any discussions about going home or receiving supportive housing.

50.    The Defendants are operating a scheme and an instrumentality to defraud the federal government.

51.    Upon information and belief, Defendants knowingly, as that term is defined by 31 U.S.C. Section 3729(b), filed, or caused to be filed, with the Federal Government applications for the payment of United States' Government funds, and upon information and belief, caused monies of the United States Government to be paid, to themselves, in excess of the amounts that were charged to various insurance companies.

52. Due to the fact CBH was primarily placing minorities with more severe mental illness, who had little or any active family support to look out for their best interest, many did not even have an ICM.

53. Due to the fact CBH at times had one hundred clients housed at TCR/New Vitae, Plaintiff pleaded that CBH place a liaison at TCR/ New Vitae proper to protect the interest of the clients.

54. Plaintiff's request was particularly urgent given the fact that generally there were no interdisciplinary team meetings or chance for clients to develop their own treatment plans, for clients who would indicate a preference to leave and return to their home communities.

55. This meant that many of these clients were voiceless relative to their desires and wants; yet Philadelphia programs with fewer minorities often had CBH liaisons situated there.

56. Plaintiff believes and therefore avers, that this request for liaisons was denied simply to supply a greater cash flow for Defendant Adam Devlin.

57. Plaintiff believes, and therefore avers, that CBH consciously places minorities into the TCR system knowing of their incompetence to provide residential treatment services, knowing that most of these clients have no family or other representatives to

advocate for them, and moreover knowing these minorities clients for the most part do not know how to advocate for themselves. By challenging inappropriate treatment, such as denial of client's rights etc., conversely non-minority clients are placed in programs mostly in Philadelphia, where they live, where they receive certified licensed, accredited and competent residential treatment.

## THE DEFENDANT'S RETALIATORY DISCHARGE OF THE PLAINTIFF

58.  On or about July 2, 2009, and following the Plaintiff's discussions with his superiors regarding the inadequate and unprofessional treatment practices of the Defendants, the Plaintiff found himself increasingly alienated by the Defendants, subjected to hostile remarks and subjected to harassing behavior by the Defendants, and was terminated by the Defendants, without any written reason for his termination.

59.  Said termination occurred notwithstanding the fact that the Defendants' lack of a palpable and credible reason for terminating his employment was implausible and pretextual.

60.  At the time of his termination, the Plaintiff had been gathering facts and information relative to the Defendants' practices from his own internal investigations in furtherance of a suit to be filed under Section 31 of U.S.C. Sections 3729, *et seq.*

61.     The reasons for the termination of the Plaintiff were pretextual in that the true reason for the Plaintiffs termination was that the Defendants were aware that the Plaintiff knew of the Defendants' illegal and fraudulent activities.

62.     The Plaintiffs discharge was directly and solely attributable to his bringing to the Defendants' attention their improper and fraudulent business practices.

63.     The Defendants' harassment and ultimate termination of the Plaintiff's employment arose after and in violation of 31 U.S.C. Section 3730(h) as a knowing and direct result of his raising the issues referred to hereinabove.

64.     The Plaintiff has been damaged by the Defendants' actions. At the time of his termination he was never given a legitimate reason for his termination, he was only told by Bill Hoke, an employee of the Defendants that "we cannot trust you".

65.     Plaintiff, prior to his termination, was subjected to a hostile work environment in which he dealt with tactics from the Defendants that were harassing and intimidating in an effort to make the Plaintiff voluntarily terminate his employment with the Defendants.

WHEREFORE, the Plaintiff, James Kot, prays that judgment be entered against the Defendants jointly and severally:

    (a).    In an amount, presently indeterminable, for violation of 31 U.S.C. Section 3730(h), the sum of back pay duly doubled together with interest o the

back pay, compensation for any special damages, attorney's fees and costs;

(b).   In addition, Plaintiff prays for such further and additional relief at law or in equity that this Court may deem appropriate or proper.

Respectfully submitted,

DONALD P. RUSSO, ESQUIRE
ANDREW CORMIER, ESQUIRE
Attorneys for Plaintiff
Law Offices of Donald P. Russo
546 Hamilton Street
Allentown, Pa. 18101
610-776-1840
Attorney I.D 25873 & 203018

## VERIFICATION

I, Dr. James Kot, being duly sworn according to law, depose and say that the facts set forth in the within Complaint are true and correct to the best of my knowledge, information and belief. I understand that false statements contained herein are made subject to the penalties of 18 Pa.C.S.A. Section 4904 relating to unsworn falsification to authority.

Date: _____Sept 25, 09_____          _____
                                      Dr. JAMES KOT